Kijakazi Hambrick v. Kilolo Kijakazi We're now going to move to case 22-3217, Rochelle Hambrick v. Kilolo Kijakazi. We're going to begin with argument for the appellant, Mr. Ehrlich. May it please the court, counsel. The plaintiff's complaint in this case is based on a series of actions taken against her from 2016 to 2020, which collectively, we argue, created a hostile work environment. Case law is very clear that all acts of harassment, harassing conduct occurring within the relevant time period, must be considered cumulatively when determining if or not if there's a hostile work environment. Mr. Ehrlich, I apologize for jumping in so quickly. Sure. I just want to determine, are you pursuing anything other than a hostile work environment claim? No. I think my complaint may have been more artfully pled, but we were looking at everything collectively, creating the cause of action. Thank you. You may continue. As we argued in the plaintiff's briefs, the district court's analysis reviewed many acts independently, then cast those aside after having reviewed those independently, and deciding for a variety of reasons why this particular incident didn't pass muster or why that particular incident did not pass muster, and then excluded those who were looking at everything together, did not look at everything together, simply threw those to the side. The court's opinion does state it was looking at everything cumulatively, but if you go through the analysis the court did, I don't see any evidence that it actually did that. Some matters were thrown aside because the court did not think they were hostile enough. Some were thrown aside because if looked at separately they were viewed as being trivial. Some acts were dismissed on various procedural grounds. The court decided that it could not consider anything it deemed to be a discreet act, especially a discreet act if it was outside the 45-day time period for a federal employee. You don't seem to be disputing the district court's finding that the record only supports three possible adverse employment actions, are you? When you're looking at it as had I brought discreet acts as separate counts, yes, it would be correct. But because I'm alleging a hostile work environment, everything must be considered together. So on your hostile work environment claim, under the law, there has to be some connection between the harassment and the conditions and your protected class, here which would be race or age. What's the best evidence in the record of some connection between these activities that she claims amount to a hostile work environment, which seem very much to be working conditions? She doesn't like that she was moved to a smaller place. There are a lot of them in there, but they seem to be about her work conditions, and I'm having a hard time seeing any link between those actions and conditions and either race or age. So I go through and defense counsel raised that in their brief. I do address those specifically. Can you tell me what they are, please? Yes. So if you start with the reassignment to the PIT tag unit, if you look at just that only, okay, so what maybe? If you look at just the fact that she was assigned to that unit and it was a drowning unit, okay, maybe not. But you have to look at everything together. So you start with the PIT tag unit reassignment, which the district court did not consider in any shape or form. Then to the drowning unit, the reasons given to her for that reassignment, one being, well, he didn't answer this question I asked you. What question are you talking about? Forget about that. And you didn't train people, but she did. And then being assigned to this unit, this new unit, the PIT tag unit, which required extensive training because there were many, many new employees there. But what's the link to the race or age? Most hostile work environment claims that the conditions themselves make it clear what the link is. Inappropriate pictures if it's a sexual harassment case or inappropriate comments involving of a sexual nature. But here, the conditions themselves, getting transferred to a different unit, getting a lower performance rating, having a smaller working environment, those conditions themselves don't convey a link to the protected class here. So just by looking at them, there's nothing that links those to race or age. What is it in the evidence that links these hostile work environment conditions to the protected class? The sexual harassment area, much clearer. Absolutely. But there's got to be something, and I'm having a hard time seeing that something. So start from the reassignment to PIT tag. She was bumped out of the debt management unit by a younger, white, Caucasian female who was going up the chain of command in a skyrocket rate. There were a number of instances where she and only she was treated one way. Nobody else was treated in that manner. You also have kind of an all-inclusive. The evidence in the record doesn't show who these somebody else's are for comparative purposes. So if she's the only one treated that way, but everybody in her unit is over 40, again, you've got to have some link, and I'm just not seeing it. But they're not. They're all much younger than her. They're all white. There are allegations of that, but I don't see evidence supporting that in the record. In terms of the respective ages? In terms of, again, a link to protected activity. Right, okay. And to say I'm treated this way and I'm the only one isn't telling or doesn't provide a link or an issue of fact unless we know everybody else in there. Come back to looking at everything as a whole, not just acts to see if it's a hostile work environment, but everything as a whole to see evidence of discrimination. If we look at the indirect evidence type scenario, we're looking for comparative employees. One that jumps out, I mentioned that it was a white, younger white, who took over the debt unit that she did so well in, and she's sent to this unit that's non-functioning and understaffed and overburdened. One of her colleagues in another unit, Bernard Malt, was sending her emails left and right, saying, You've got to get me these cases. You've got to get me these cases. What's taking you so long? She made it clear to him, This is why it's taking me so long, including you, your unit. You're not getting your part of it done. Therefore, I can't get my part of it done. These emails are coming constantly. During around the same time frame, at one point, her manager comes to the plaintiff and says, Hey, stop sending emails to other people. Just call them up or walk over. So yet this guy in his unit is allowed to constantly send emails over and over again. So that's one example. There was the on-the-job discussion that she was given, claiming that she was late for a meeting. That particular situation, which was the only time she missed a meeting or that she was late to a meeting, she made it clear and her boss knew she was at a conference with a congressional aide, which is one of her many duties in the PITTAG unit. So she comes after that important congressional aide phone conference and then gets a verbal for being late to that meeting. Because she's been at all these meetings both before, during, and after the situation, she knows that many other young white Caucasian people are coming to those meetings late or not coming to those meetings in any shape or form, yet nothing is done to them. So those are just some of the examples that I was talking about. Prior to her getting thrown out of the debt management unit and going over to the PITTAG unit, and we mentioned this in the arguments, there were a number of older black managers at her level or above. Who were being asked to train younger white Caucasians and then they were then thrown out. Dismissed, pushed out, saw the writing on the wall, and left. So that's another example I think that ties us together. Many of the culprits that were doing these things to her had numerous EEO charges filed against them for the same types of actions. So those are what I'm thinking about on the top of my head as to why this is all tied together. The failure of the district court to consider the assignment to the PITTAG unit in any shape or form was extremely prejudicial to her whole claim of the hostile work environment. Starting from that reassignment to a unit that was just not functioning severely understaffed, having 10,000 or 12,000 cases that are very old, she got through those cases. Even though she's getting hassled by her white counterpart in another unit to get me these cases, even though his unit was not completing their part of the case to get it done so she could get it done, she was the only manager at her level who supervised other employees. She's a GS-13 manager. Other GS-level people had a cubicle, but they did not supervise people. She was the only GS-13 manager supervising other people who was taken from an office to a cubicle, given no explanation whatsoever. Despite the incredible hardship she had to get into this unit and get it up and running, she then received in the following evaluation period the worst evaluation she'd ever seen before. During her meeting with her manager, she was told she was coasting. This is being told to somebody who cleared a 12,000 backlog that she inherited, down to I think 800 or some odd cases. This is someone who was given additional extra assignments to do, which were extremely time-consuming, which she completed, yet she's told she was coasting. She was told, well, yeah, you got rid of that backlog, but what about this case and that case? Those are old cases. When she tries to explain, yeah, but I needed these other units to get their portion of the case done, she said, you know what, you cannot take constructive criticism. That's why we're not giving you the evaluation you think you should have gotten. Would you like to reserve the remainder of your time? I was going to, unless the Court has any other questions. Very good. Thank you, Mr. Ehrlich. We'll move now to Ms. Hancock on behalf of the Epilee. May it please the Court. Before I get to my Bain argument, I want to address some of the allegations and arguments that appear in the plaintiff's briefing and some of the factual allegations that you heard just now. And the takeaway that I wanted to note is that a lot of the arguments, particularly in the briefs, really is not backed up by evidence. The District Court painstakingly, it's apparent that the District Court painstakingly went through the party's local rule 56.1 statements, looked at the supporting exhibits, and correctly considered plaintiff's allegations that were supported by evidence. But much of it isn't, and he rejected that. And yet we're seeing it again on Appeal. And so, you know, to take just one example, there's this repeated argument that Christina Edwards, who is a younger white employee, received a higher performance review, even though she, too, had a pending backlog of something like 12,000 cases. And the District Court looked at this, and he explicitly disregarded this. He mentions it in his opinion because it's not supported by evidence. The only citation is plaintiff's deposition testimony. And at her deposition, she said she actually didn't know what other managers' performance ratings were. And not only did she not have firsthand knowledge, but nobody had even told her secondhand. So there was no basis for that. Likewise, the assertion that Bernard Mull, who is a, he's like a peer of the plaintiff. He's another manager in another module. And we've seen over and over again this argument that he bombarded her with e-mails, and they're coming over and over again in harassment. The District Court described those e-mails accurately and thoroughly in his opinion. And what we're looking at are e-mails sent over the course of about a five-month period during an alleged five-year hostile work environment. And there are six e-mails. It's not bombardment. It's not consistent harassment. And the e-mails on their face are not unprofessional. They're following up on urgent topics. With respect to the, you know, there was some questioning as well about the different career trajectories or the argument that black, older black employees had different basically career trajectories and that they were held down at the, to the benefit of younger white employees. And Ms. Hambrick made a lot of, you know, alleged that and argued that before the District Court. She's made that argument again here. The court considered that as, he did consider whether any of those employees could be considered comparator employees. And that matters because you're trying to figure out, is there a there there? Can we infer that there was discrimination here? And the problem is that we have no details or evidence or information that would allow us to make an apt comparison. We don't know who the selecting officials were. We don't know what the requirements for the positions were. We don't know what evidence, you know, what information the selecting officials considered. And we don't have the application information about the younger white employees and the older black employees. So you can't draw an inference of discrimination based on these bare allegations that aren't supported by any evidence. The only thing that Ms. Hambrick cited was, again, her own testimony on that point. I do want to address the plaintiff's assertion in her brief. That's something that we said is not supported by evidence. Just to clarify the record on that. There's this assertion that it was well known that Ms. Hambrick and her prior supervisor, prior to the reassignment to PyTag, that it was well known that they had a poor working relationship and didn't get along. That's from the District Court opinion. He got it from our Local Rule 56.1 Statement of Facts where we said exactly that. It was well known they had a poor working relationship and didn't get along. And we had cited the plaintiff's own deposition testimony where she discussed at length the fact that she really did not get along with this woman, Evelyn Harris. The plaintiff did not deny that allegation in her Local Rule 56.1 Statement, yet we see her re-raising this issue on appeal. And these are just some examples of the way in which we're asking the court to really keep in mind that there's a stark difference in this case between the argument and the allegations and the evidence. And the District Court got it right when he painstakingly went through the Local Rule 56.1 Statements and the evidence. Turning to my main argument with respect to exhaustion, we agree that the District Court was not correct in concluding that otherwise time-barred discreet employment actions categorically can't be considered as part of an otherwise timely hostile work environment claim. The clearest articulation of the rule I've seen is in the Green Supreme Court case that we cite, but in essence, yes, you can consider otherwise time-barred discreet employment actions. The test is whether it is all part of the same actionable hostile work environment. And in this case, and the test for that is set forth in the Ford and the Lucas opinions from this court. So looking at the time-barred discreet employment actions in this case, there's two categories. First, there are these positions that the plaintiff applied for after she filed her first EEO complaint. So they're in 2018, 2019, and 2021. And then the other category of time-barred discreet employment actions is the assignment to PyTag itself. Okay, we agree that the assignment to PyTag is in or could arguably be considered part of the same actionable hostile work environment. The other positions that the plaintiff applied for and was not selected for, we have no information at all that would allow us to conclude that this is like a continuous course of conduct that's somehow linked together. We don't know who the – there's no evidence about the decision makers. Sort of similar to what I was saying before about the alleged comparative employees, all we know is that the plaintiff applied for positions and didn't get them. But we don't know who the selecting officials were, who the people were who were selected, what information the selecting officials considered, how the selection process worked. Also, many of these positions are not even within the Great Lakes Service Center. So they're not even in this massive subset of the Social Security Administration, which is where the plaintiff works. I think at one point, you know, I read plaintiff's brief to be asserting that one possible link between all of this is that Angelo Petros, her supervisor in the PyTag unit, gave her a recommendation with reservations at some point and this lowered performance review. And then it's reasonable to infer that this – it was sort of like a fruit of the poisonous tree argument. Like, this traveled with her and impacted her other applications. There's just no evidence that supports that, and it's not a reasonable inference. In part, if you look at the dates of the applications, and the plaintiff includes them on page two of her brief, all but two of these positions were before this allegedly discriminatory lowered performance review. So the timing, I just want to note, doesn't even make sense on that. Are you referencing there the 2019 performance evaluation? Yes. Right. And I want to note on that that, you know, at that point, this lowered performance evaluation is three years after Ms. Hamburg is assigned to PyTag. So she is not claiming – Ms. Hamburg is assigned to PyTag in 2016. She is not claiming that her 2016, 2017, 2018, 2020, 2021 performance reviews are discriminatory or retaliatory. There's just the one in 2019. That's three years after she was assigned. Turning to the merits of her – you know, the substance of her hostile work environment claim, the most glaring issue from our perspective is the one that has been discussed, which is the lack of any connection to the plaintiff's protected characteristics. We don't – there's no evidence of that at all. And this is very different from what we all think of with a hostile work environment case, where you're parsing whether there was one offensive statement or five offensive statements, and how offensive were they. There's not even a reference anywhere to the plaintiff's protected characteristics. And there's no evidence – admissible evidence or even really allegations suggesting that any of this treatment was anything other than just running the business at the Social Security Administration. I do want to note also this assertion that counsel just made, that Ms. Hamburg was bumped out of her prior position and replaced by a younger white employee. I'm not aware of any evidence in the record to support that. He may be thinking of this woman, Christina Edwards, who was in a different section, but I don't know who took Ms. Hamburg's place in her old job. She was moved to the PyTag position, and there's just no evidence about who got her old job. The other way, of course, as we set out in our brief, that Ms. Hamburg's hostile work environment claim fails is that she hasn't submitted evidence showing that it was an objectively offensive, severe, or pervasively hostile work environment. Coming back to what I said originally, the argument and a lot of the allegations are not borne out by the evidence. The fact is that Ms. Hamburg's job function was to process a very large number of Social Security beneficiary cases in an expeditious way. That's the whole function of the Great Lakes Servicing Processing Center. They deal with what are called post-entitlement actions. These are people who already have their benefits, and there may be some issue with whether they were paid too much or too little, and you have to turn it off and on. These are real people, not just Social Security numbers. And so, yes, Ms. Hamburg was supposed to expeditiously move this backlog, just like everybody else was at the Great Lakes Service Center, which, by the way, itself had about a 600,000 case backlog at the time. And as we've cited the evidence in the record, it was in a state of crisis. Everybody was working a lot, and it is important for me to keep in mind, they sort of view it as almost a client relationship with these beneficiaries and field offices, because, again, they're processing benefits for real people. Any idea how many employees at this particular center? At Great Lakes? On the order of several hundred. Okay. And, yeah, several hundred employees. The PyTag unit where Ms. Hamburg was, you know, I've seen, she supervised, I've seen between 12 and 23 employees, but it's a massive operation. This is normal workplace friction. Ms. Hamburg was assigned to a high-profile division that handled sensitive inquiries. I'll note another issue she has is that she received 1,000 cases or over 1,000 cases all at once. Again, this happened about three years into her job. This is what her division is supposed to do. This is what Great Lakes is supposed to do, efficiently solve problems for Social Security beneficiaries, and that's what they were trying to do when they had this automated program where they assigned the cases to Ms. Hamburg's unit all at once. Unless the court has any questions or any, I will rest, and we ask that you affirm the ruling of the district court granting summary judgment in favor of the Social Security Administration. Thank you, Ms. Hancock. Mr. Ehrlich, rebuttal argument. So the person who was taking over the debt management unit when Ms. Hamburg was sent over to PyTag, Alicia Hatchett, we do identify her both in the Rule 56 statement and in the brief, white and younger. She was also one of the ones that the plaintiff was pointing to that was on a fast track career moving up. It's not six emails over the course of four years that Mr. Moll and his people were sending to her. There's only six that are in the record, only within a short period of time is what we're talking about. The personality conflict that was discussed by counsel as a reason, which is the first time I'm really hearing this now, I shouldn't say that, it was in the reply in summary judgment was the first time I was hearing it, that the personality conflict was the reason as to why Ms. Hamburg was sent over to the PyTag. That was not given as a reason for why she was being reassigned, number one. Number two, what was discussed in depositions about that individual, Harris, was that she was toxic to the entire unit, that nothing was done to her as far as we know, only the plaintiff was sent somewhere else. Plaintiff, when she was assigned or reassigned to the PyTag unit, had 12 employees, most of the other units had 40. 40? 40, yes. On the promotion issue, we are not hanging our entire case on this. It is one of many things we're arguing shows collectively evidence of discrimination, and it wasn't so much that she should have gotten that position or this position, we do argue that too, and I grant the issue that other than the promotion that she lost out to to Mr. Bajorek, that there aren't a lot of other details to it. But the larger point we were trying to argue, and should have been considered but wasn't, was that she continually was not getting positions, other older black managers were being pushed out of their positions, and you had a whole group of white, younger individuals who were getting these developmental assignments and then getting them to a higher level of GS positions in a very, very short period of time, one of those being Alicia Hatchett. Looking at this as part of, among everything else, the cumulative weight of all the other evidence we raised. The final point I want to make is when the plaintiff first came to me and talked to me about the first couple of incidents of discrimination, I looked at it in the same way the district court did and the defense are looking at it. Not so sure about that. Yeah, probably not. But I investigated more. I sat with her more. There were so many incidents that were raised by her and the evidence surrounding that, that it got to a point where a defendant can explain one incident maybe, a second incident maybe, but not everyone, not all those incidents, at least in a reasonable and credible way, when you get to a point where there's so many incidents of discrimination and retaliation that we allege, it gets a little questionable to say that there was an excuse for every one of those. This cannot be cast aside as a question of summary judgment, simply as coincidence or just bad luck or personality conflict. Thank you, Mr. Ehrlich. Thank you, Ms. Hancock. The case will be taken under advisement.